513-0484, Julie Daniels, Workers' Compensation Commission Do you think we should go back to our brief? There's a method of... It seems to me it's as good as it is. Sounds possible. Counsel, you may proceed. May it please the court, opposing counsel, my name is Dan Klosowski of Woodruff, Johnson & Palermo, and I'm here to represent the appellate, Miss Daniels, in this matter. I would urge this court to reverse the decision of the Circuit Court of Fayette County. Your Honors, there are three distinct conditions for which the appellant received treatment in this matter. Her chest, her neck, and her lumbar spine. The appellant believes that each of these conditions was caused by the work accident of August 10, 2006. The court erred in finding that the lumbar condition was not related to the work accident. The previous courts also erred in finding that there was an overpayment of TTD benefits. And finally, the court erred in finding that the medical benefits had all been paid by appellate. What was the date of the injury, August 10, 2006? Yes, Your Honor. When was the first time that there's a record, any record in her medical record, that she complained of low back injury? Your Honor, the first treatment that she received for low back pain was in October of 2008, which was following the more than a year-long treatment for her chest condition. She had a cervical recommendation as of February of 2007, and six months of consultations with specialists before surgery on August 16, 2007. Who's Dr. Penick? Penick, Your Honor? Yes, Penick. That's the orthopedic doctor who performed the cervical discectomy and also recommended the lumbar fusion procedure. He contends in his records that the first time he recorded any complaint of low back pain from the claimant was at her first office visit of February the 10th, 2009. Is that right? She, that is the first time that she discusses the condition with Dr. Penick, but she had been receiving chiropractic care prior to that and had also reported pain to her primary care physician. Let's hone in on a couple of other things, because you can say this is the battle of the experts, and, of course, you probably have some legitimate arguments to make as to why claimants' experts should be believed, but here's what I think troubled the arbitrator of the commission to be very blunt. Your client testified that when she went to Fayette County Hospital on the day of the accident, she reported back pain. That's completely contradicted from the records. They don't reference any type of low back pain, any injury, any trauma at all to the back as a result of the work accident. No treatment prescribed or administered. According to them, your client said nothing about any injury. Then she goes the day after the accident to the doctor. Is it Oxenschlager or Agenschlager? Oleg Schlager, I believe. And, again, reference no back pain, no injury, no trauma to the back. And then all of a sudden, months later, this comes up. She actually testified that she did this. The doctor's records refute her testimony, don't they? I believe that there is a lack of history in the records, Your Honor. This is an individual who sustained multiple serious injuries due to this accident. The first and major focus of treatment was for her chest condition. Right, and that's not disputed. The records substantiate that she did report that. Correct. And then following the treatment for her chest condition, they moved on to the treatment of the cervical spine. And Dr. Pensick testified during his deposition that when there's both a cervical injury and a lumbar injury, the cervical injury would be addressed first to protect the cervical spine, while then later treating for the lumbar injury. That makes perfect sense. But that's treatment. The claimant didn't report any problem at all with the back whatsoever until months later. Now, your argument would be more compelling if, in fact, if some of the records referenced her complaint about it, and the doctor says, well, you know, let's hold off on that because we need to deal with the cervical issues first, and then we'll get to the back. But the problem is she's testifying under oath, and she made all these complaints. The medical records completely refute that. Doesn't that bear on her credibility? I believe it does bear on her credibility, Your Honor, but I would also note that she stated, and I believe her doctor's records say as well, that she had complained of these pain complaints before. And the focus, although it was not noted in the medical records, the focus was first put on the two other conditions prior to treating her for a lumbar spine. So her doctors are acknowledging that she had made these complaints just in later records. Well, what do we do? If the commission and the arbitrator have some reservations about the credibility of the claimant, what do we do with that? Well, Your Honor, although she may not have been the best witness during the trial, Wait a minute. It's a little more than that, isn't it? Didn't Dr. Petrovich catch her at exaggerating her symptoms? He said he performed distraction testing on her and found she had full mobility in her lumbosacral spine, but when he asked her about it, she exaggerated it, claiming that her range of motion was limited. And in his opinion, the claimant exaggerated her symptoms. He also found absolutely no objective testing or radiographs that would sustain anything other than a normal lumbar spine. I believe Dr. Petrovich did find that during his Section 12 examination. However, Dr. Pensick had sent appellant for multiple lumbar MRIs, which showed pathology, and also a discogram on August 5th of 2010, which showed positive pathology and was the basis for his recommendation. What did Pensick say about all that testing? Your Honor, I can't say... Petrovich. Your Honor, I can't say what Dr. Petrovich said regarding those specific tests, but I know that that's what Dr. Pensick used to base his decision. He said the discogram and other diagnostic studies showed no evidence of disc herniation, annular tears, or anything that was abnormal to the claimant's lumbar spine, is what he said. I believe what Dr. Petrovich also did not state during his report is that the control disc was the only disc where appellant did not report pain complaints. She reported pain complaints in the two discs. So everything is subjective? Everything is subjective? Petrovich says she's exaggerating her stuff, so why couldn't the Commission believe it? The Commission could have believed Dr. Petrovich, but I know the arbitrator also noted that her records were devoid of history or medical treatment prior to her treatment with Dr. Pensick, which was inaccurate, and I cite in my brief the multiple records of her prior treatment for back complaints. Your Honors, I'd like to move to my second point regarding medical benefits. Now, if you are to accept my argument regarding the lumbar condition, it would follow that medical benefits for the treatment for the lumbar condition should be paid by appellee. It also follows that we don't accept your argument on the lumbar condition. She doesn't get any benefits for future medical. For future medical, yes, Your Honor. But one other issue that I would like to bring up regarding medical benefits is past medical care that was not paid by appellee, and specifically the care to the cervical spine. There's really no reason why these bills should not have been awarded previously. Dr. Pensick, as well as Dr. Petrovich, the Section 12 examiner, opined that the cervical condition was related to the accident of August 10, 2006. The treatment for the cervical spine was all administered prior to December 15, 2009, which was the MMI date that was determined by the Commission. However, those bills were not awarded. My opponent makes an argument that since the bills were not certified, they should not have been admitted as evidence at trial. However, the arbitrator listened to these same arguments during the hearing and ruled that the bills should have been admitted. See, that was the question that I had. The respondent made an objection, foundational objection. Okay, they're not certified, et cetera. The arbitrator basically notes it and allows it to go in. And then when a decision is made, he finds that the respondent paid all the bills and there's no explanation as to how the conclusion was arrived at. And that's the very reason why I'd like to bring up that point today, Your Honors. The bills that were submitted were all either under the cover of Commission subpoena, which provides a rebuttable presumption that they are certified, or there was actual certification from a custodian of records. Well, that's your argument. We don't know whether or not the arbitrator accepted it or the Commission accepted it, rejected it. There's no reference as to the basis for denying it, correct? Correct. It just says they're all paid. Right. And that's not accurate because many of the bills that were submitted as evidence at trial for the cervical care were unpaid. And so that is one of our main points today is that those bills should have been ordered to be paid by FLE. There's really no argument that they should not be paid from a standpoint of a doctor or any of the courts that have heard this case. Getting to my third issue, Your Honor, the temporary disability benefits, there was an order that those benefits were overpaid. Again, if we're to look past the lumbar argument and look to the chest condition, which is not in dispute at all in this situation, Dr. Feinberg, who treated her for the chest condition, stated on November 29, 2007, which is on the dictations on page 361 of the record, she stated that an appellant had several questions regarding her future. And she noted that she, quote, made it very clear, this is Dr. Feinberg, that she will never be able to go back to any type of overhead work. She will not be able to lift with her arms extended. She will be limited to lifting 10 pounds. She cannot lift with any type of rotation or twist. And, quote, Dr. Feinberg then continued, stating that it was, quote, her professional opinion that the patient is a good candidate for retraining. She could do computer work or other sedentary work. On December 18, 2007, which is on page 360 of the record, Dr. Feinberg repeats the restrictions and states once again, quote, I did explain to the patient quite firmly that she will not be able to go back to her other type of work. And again said that the appellant would be a good candidate for retraining. My opponent cites to a report from Dr. Patterson on January 11, 2008, which says that she can return to work. Dr. Patterson goes into no detail regarding that opinion. And this opinion was only three weeks after the opinion of Dr. Feinberg. These are both treating physicians. And I would argue that it's highly unlikely that one physician would state that she needs to have 10-pound lifting restrictions and is a good candidate for retraining and should do sedentary work. And just three weeks later, another physician would state that she can go back to a full-duty job where she's lifting up to 50 pounds. Appellant was also seen by a vocational counselor on January 4, 2010, who noted that there was an unlikelihood or inability that she would be able to return to work, that a transferable skills analysis needed to be performed, and that she was even having difficulties with activities of daily living. This transferable skills analysis and vocational retraining would have been in line with the recommendations of Dr. Feinberg, but appellant was never again contacted by the vocational counselor. Your Honors, it's clear from the medical records that the condition of appellant's chest has remained the same since the end of 2007. These were permanent restrictions that were placed on appellant in direct response to questions about her future. She has a prosthetic device and had to be seen by half a dozen specialists to determine what surgery would be best for her chest condition and was not in a position to go back to her full-duty work following that procedure. She would be entitled to continuing maintenance benefits and a finding that those benefits were overpaid to the appellant is incorrect. Well, didn't the claimant continue to work with Pensick after the fusion and told him she was healed, was not experiencing any weakness or numbness? She continued to treat with him for several months after the operation, noting that she had no neck or arm pain. By December 15th, Pensick said he exhausted all possible treatment and pain management and she doesn't need to follow up. Can't the commission find she's reached MMI? Annette? Your Honor, I believe that those notes from Dr. Pensick are only in relation to the appellant's cervical spine. And she did have a good result from the cervical fusion. It relieved the numbness and pain that she felt in her arm as well as her neck and she had a good result from that treatment. But Dr. Pensick was not her treating physician for the chest condition and the fact that she had a good response to the cervical fusion surgery doesn't change the fact that she had the previous chest surgery before that which limits her ability to go back to any type of work that's similar to her previous work for the appellee in this matter. Your Honors, again, I lay out in my brief the argument that appellant's lumbar condition was related to the work accident. There was no intervening accidents and her doctors have opined that the treatment or the condition was related. I would ask that the recommendation for a lumbar fusion procedure be ordered to be paid by appellee and as well as the previous bills for the cervical care and that the finding that there was an overpayment of TTD benefits be reversed due to the fact that appellant is entirely continuing maintenance benefits. Thank you, counsel. Counsel may respond. Hello, thank you, Your Honors. May it please the court, my name is Steven Traps. I am here representing the appellee, Aldi, Inc. in this matter. As this court is well aware, the standard on review is against the manifest way of the evidence and there is sufficient evidence in this file to support the findings of the arbitrator, the commission, and the district judge over in Fayette County. This matter was tried as a 19B in which she was seeking additional treatment for that low back condition back in November of 2011. Her credibility was an issue and the court correctly found as the trier of fact that her credibility was lacking. Specifically, the arbitrator said, and this is in his opinion, petitioner's testimony of her alleged complaints of pain in her low back soon after the injury occurred is thoroughly refuted by her admissions on cross-examined and the medical records. As this court correctly pointed out, her complaints of low back pain and that she supposedly told her medical providers all along is not credible. She gets on the witness stand and says, I hurt myself. I complained of pain to the ambulance people. No, of low back pain. No, you didn't. I complained of pain to the emergency room. No, you didn't. She admits that. When she's handed the records at trial, show me where you complained of low back pain to this doctor. She says, you're right, I didn't. She then goes to her own treating physician. She says at trial, I complained of low back pain. She's handed the records. No, you didn't. Then she goes to an orthopedic surgeon or an orthopedic practice that she's referred to, Benuti Clinic, Dr. Gray and Dr. Reuter. She says she complained of low back pain there. No, she didn't. She admits it. This process keeps going on. She then went to Dr. Feinstein. She then went to Dr. Kaplan. She then went to Dr. Patterson, who did the chest surgery. And then she went to NADF. And then she went to PENCIC. She did not complain of low back pain to any of these doctors, really, until she gets to Dr. PENCIC. Now, opposing counsel did reference that she had some complaints, really, in October of 2008 when she went to this chiropractor in NADF. Well, he does take a history of her back hurting, but he's not really specific about it. He throws in everything. He says she's got elbow complaints. She's got shoulder complaints. He even made a citation of one of her breasts now drooping as a result of the accident. But when she's asked at trial about this, and she's shown her patient intake sheet when she goes to this chiropractor, it's clear what she was complaining about. She was complaining of pain in her neck and her upper back. Nothing with her low back. I think we're somewhat familiar with the evidence on the causal connection. But let me ask you, the next phase is the issue on the TTD overpayment and credit. What's your take on that? Okay. This case wins or fails on causation. If you believe that she's entitled to this surgery, which, by the way, even Dr. Pensick said her MRI was a normal MRI and he recommended this surgery based on her subjective complaints. But anyway, in terms of the TTD, opposing counsel talked about, well, there's this opinion by Dr. Feinstein and the treating physician for this chest thing. Back in November, December of 2007 and January of 2008, Dr. Feinstein was the one who said, I'm putting these restrictions on her. Well, those restrictions were placed on her during the course of her treatment for the chest condition. The treating physician for the chest, Dr. Patterson, he releases her and returns her to work. He doesn't mention any restrictions. And that's at page 444 in the record. She then goes to Dr. Pensick and he releases her in December of 2009. He doesn't make any comments about restrictions. So she's under no restrictions. Who's Dr. Patterson? Dr. Patterson, he's the treating physician for the chest condition. He did the surgery on her. He authorized Clayman to return to work, correct? Yes, and that's at page 444 of the transcript. So then she goes to Dr. Pensick and he releases her in December of 2009 when the commission said we found her at MMI. He didn't place any restrictions on her. The only note about a restriction in December of 2009 when she goes to Pensick is that Clayman tells Dr. Pensick, oh, by the way, don't forget my restriction that I'm under. I reminded him again about my restriction. He didn't place one on her. And if it was truly the intent of Dr. Pensick to treat the cervical spine first, then the lumbar spine, he wants to release her. He releases her in December of 2009 and says you don't need to return. She does return 7 months later, but not because it was scheduled or not because Pensick said let's take a look at that lumbar spine now. It's because one of her other doctors referred her back to Pensick when she's making these complaints about my low back hurting. So she finishes treating for her chest injury. She finishes treating for her neck. She gets released in December 2009. She starts these rumblings and moanings, oh, my back hurts. She goes to these other doctors. They then send her back to Pensick and Pensick says, oh, yeah, let's take a look at that low back now. There is absolutely no credibility of this Clayman and I think there is sufficient evidence in the record to say that she was not credible and that her complaints about this low back are just thoroughly refuted. The final issue is medical expenses, which seems a little perplexing. Well, according to him, they tendered these records. There was an objection, I don't know if you were trial counsel, that they were not certified, they were not accurate. You were? I was trial counsel. Okay. So as we understand from the record, the arbitrator says, yeah, I understand your objection, but he allows it to come to evidence, right? Yeah, I objected. I said foundation, some of these records aren't certified. And he kind of flips through them and says, well, I'll let them in so we can basically take a look at them. Then they come in and all of a sudden there's an order that they're denied. On what basis? Well, I think what he was saying, all the medical records have been paid. All the medical records have been paid up to the point where we're now going to talk about the low back. I'm sorry, the cervical spine and chest. This is your interpretation of what he meant. Did he say what he meant? Did he say the basis for holding they were paid? Well, I don't know that he explains it that well. I will give you that. He explained it all. Forget about well. Well, I will say that this is a 19B. If there's a problem with those medical records not being paid, they can be addressed in the final award. They can go back and get the proper evidence to say, hey, these weren't paid. Not if they're denied and we affirm it. They're stuck with it. The other problem we have with these medical records, though, is in her testimony, when she was on the stand, I said, after I objected to these records having improper foundation and other things were added in, I said, are all these medical bills related to your work accident? No, not all of them. So now we have to go through piece by piece and look to see what's for her cold, what's for her flu, what's for her headaches, and see what's related and what's not. The evidence wasn't there to award them because they didn't have sufficient evidence to show. But that was your objection to the arbitrator. Sort of a foundational objection, wasn't it? It was. Basically, by implication, he overruled it. He takes it in evidence, which theoretically should be considered, and then he says, no, they're all paid with no explanation. Is that fair? Well, I believe when he's... Do you agree that there were unpaid medical bills for undisputed injuries? There were unpaid medical bills. Notwithstanding your foundational approach. Right. I do believe there were some unpaid medical bills that I think were related to Dr. Pensick. And if that's the case, if that is the case, then those probably should have been paid. No, we don't know that's the case because we don't know what can be considered. And you see the problem here? But if this case isn't over with in the sense that it was a 19B. I just answered that. Right. Right. But the problem, though, with trying to say all these bills should be awarded is that she admitted in her own testimony, you know, no, not all these bills are related to my accident. So now the court's got to go through line by line, entry by entry. To vacate the award and tell the commission they didn't make sufficient findings of fact as to which of these bills should be paid or shouldn't be paid. And therefore, they've got to do it on remand. Well, I think the proper thing that should have happened was those bills should not have been allowed in based on my objection. They were allowed in. I'm sorry? They were allowed in. They were, and I think he was more curious to see what the bills were rather than he wanted to look at it in terms of he wanted to review it as to the weight of the evidence as to. See, this is your interpretation, your speculation of what his mental processes were. That's not sufficient for us to review your speculation as to what he meant to do. See the problem? I do see the problem, but I don't know that this court could, at this point in time, could then say all these bills should be paid because. Wait a minute. Wait a minute. Maybe what we ought to do is vacate the order and make them figure it out. That we can do. If we affirm it, we affirm it, he's dead in the water. That's it. It's over. Well. Do you know how much these bills were that are in dispute? No, I do not. We can ask him, but. But there's no, there's, again, going to my objection in these bills. Was your view they were improperly admitted, they should not be considered, period? Yes, that was my view. And she was asked at page 1476, are all these medical conditions related to your back or neck or your chest? No, not all of them. And then there was notes about what hasn't been paid in handwriting, scribbled on, without any foundation as to who put those on. Would that send a strong message to properly introduce evidence? I didn't hear you, I'm sorry. I mean, your view would send a strong message to practicing bar that you ought to know how to introduce this thing. Yeah, yes. So, going back to causation, is that I'm asking this court to affirm the commission, the arbitrator, and that. Completely. Yes, yes I am. Thank you. Thank you, counsel. Counsel, you may reply. So how much was unpaid, in your estimation? There are bills of almost $100,000 outstanding for the cervical care. How much of it refers to something other than the lumbar spine? Comparatively very little, Your Honor. The bill for the St. Mary's Hospital, where she actually had the cervical procedure, is more than $45,000. There's a bill from Dr. Pensick for over $22,000 just for the cervical care, and another bill from St. Mary's Hospital for a cervical discography, which took place before the surgery, which totals over $11,000. So the majority of the bills that are outstanding are related directly to the cervical care. And, of course, we wouldn't ask for any treatment for treating a cold to be paid, but throughout this course of time, some of the bills that were admitted were for her primary care physician, who she had seen for other ailments. Your Honors, I also would once again ---- Your opponent, Ms. Breed, which is his entitlement to do, attacks those bills saying they weren't certified, they're hearsay, they listed medications that are unrelated to the injuries she suffered, and are those medications listed in Exhibit 15 all related to the treatment of your back, neck, and chest? The answer, no, not all of them. And the bills didn't differentiate between work-related treatment and non-work-related treatment. So I suppose the question is, if you don't lay the proper foundation for them and they don't get in, don't you have to live with that? I would agree, Your Honor, but in this situation, the bills that were admitted at trial were separate exhibits from the medical records. However, those bills that were actually a part of the medical records that were subpoenaed under a commission subpoena. And when there's a commission subpoena, there is a rebuttal presumption that those bills are active. Which of those bills are they? I would have to look back at the specific exhibits. I know that there are Exhibits 15 and 21 are the bills. If you don't argue with your brief, are we supposed to do it? And I do lay out in my brief, Your Honor, the specific bills that are unpaid related to cervical care and the page numbers of the record. It's on page 24 of my brief. And it lists out each of the bills that are unpaid that are related to the cervical condition specifically, as well as then the lumbar condition following. And if there are bills that are included in those bills that are not related, then I would agree that it should be determined by the commission. Now, are some of those bills the uncertified bills? No, Your Honor. Those were all certified? They were all under cover of subpoena. Yes, Your Honor. My final point would just, again, looking back to the TTD argument, Dr. Feinberg was specifically responding to questions about the appellant's future work and future ability to perform work. Dr. Patterson provides no explanation. And I would therefore argue that Dr. Feinberg, who is specifically responding to questions, those are permanent restrictions that were placed on the appellant, and therefore she would still be entitled to those continuing maintenance benefits as well. Thank you. Thank you, counsel. Both of your arguments in this matter will be taken under advisement. The appellant's business decision shall issue. Court will stand in brief recess.